# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant RAYMOND P. PASAY**
**United States Army, Appellant**

ARMY 20140930

Headquarters, 1st Cavalry Division
Rebecca K. Connally, Military Judge (arraignment)
Wade N. Faulkner, Military Judge (trial)
Lieutenant Colonel James D. Levine, II, Acting Staff Judge Advocate (pretrial)
Colonel Alison C. Martin, Staff Judge Advocate (recommendation)
Lieutenant Colonel Michael D. Jones, Acting Staff Judge Advocate (addendum)

For Appellant: Lieutenant Colonel Melissa R. Covolesky, JA; Major Christopher D. Coleman, JA; Captain Joshua G. Grubaugh, JA (on brief); Major Christopher D. Coleman, JA; Captain Joshua G. Grubaugh, JA (on reply brief); Lieutenant Colonel Christopher D. Carrier, JA; Captain Joshua G. Grubaugh, JA (on supplemental brief).

For Appellee: Colonel Mark H. Sydenham, JA; Lieutenant Colonel A.G. Courie III, JA; Major Melissa Dasgupta Smith, JA; Captain Christopher A. Clausen, JA (on brief).

31 August 2017

---------------------------------------------------------------------
MEMORANDUM OPINION ON RECONSIDERATION
---------------------------------------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

WOLFE, Judge:

In this decision, prompted by appellant's motion to reconsider, we: A) further explain our rationale for not adopting a vertical imputation theory of acting as counsel within Rule for Courts-Martial [hereinafter R.C.M.] 902(b), explain that the military judge did not act as counsel in this case in his former role as chief of justice (CoJ), and determine that even if the military judge had previously performed the actual duties of a disqualifying position in the instant case that any such structural

error can be and was waived; B) further detail our decisions on appellant's ineffective assistance of counsel claims; and C) determine pursuant to our Article 66(c), Uniform Code of Military Justice [hereinafter UCMJ], authority that appellant's sentence of 51 years of confinement is too severe and reduce the term of confinement to 45 years. We also adopt our previous finding and rationale that the evidence was factually insufficient to support appellant's conviction for Specification 12 of Charge I, rape, and affirm only a finding of guilty to the lesser-included offense of sexual assault by bodily harm.

## BACKGROUND

Appellant, Sergeant (SGT) Raymond Pasay, appealed his conviction for the rape and sexual abuse of his daughter, AM. A military judge sitting as a general court-martial, convicted appellant of two specifications of abusive sexual contact with a child, two specifications of aggravated sexual abuse of a child, two specifications of aggravated sexual assault of a child, indecent act, rape, and production of child pornography in violation of Articles 120 and 134, UCMJ, 10 U.S.C. §§ 920, 934 (2006 & Supp. IV; 2012).

The military judge sentenced appellant to a dishonorable discharge, confinement for fifty-one years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The military judge also credited appellant with fifty-one days of confinement credit against the term of confinement. The convening authority credited appellant with fifty-one days of confinement credit and approved as much of the adjudged sentence as provided for a dishonorable discharge, confinement for fifty-one years, and reduction to the grade of E-1.

Of appellant's five original assignments of error, we provided a detailed discussion of the issues regarding ambiguous findings, disqualification of the military judge, and ineffective assistance of counsel. *United States v. Pasay*, ARMY 20140930, 2017 CCA LEXIS 268 (Army Ct. Crim. App. 19 Apr. 2017); *See also United States v. Walters*, 58 M.J. 391 (C.A.A.F. 2003). While we determined that the findings were unambiguous, we also found the evidence factually insufficient to support appellant's conviction for Specification 12 of Charge I, rape. We did not otherwise discuss appellant's claims that the remaining specifications were factually and legally insufficient as we found the evidence supporting the other specifications to be sufficient. We also did not address in depth appellant's claim that he was entitled to sentencing relief because it took 276 days to conduct post-trial processing. We found no due process violation and did not find the sentence to be inappropriate notwithstanding the time it took to prepare appellant's case for convening authority action. Lastly, we found the matters submitted personally by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982), were

2

either duplicative of the assigned errors or did not merit individual discussion or relief. We adopt these holdings and their rationale.

Appellant moved this Court to reconsider two aspects of our previous decision. First, appellant asks us to relook at whether the military judge, Lieutenant Colonel (LTC) Wade Faulkner, had previously acted "as counsel" in the same case. Appellant asks us to reconsider our decision not to adopt the vertical imputation theory of resolving when a military judge has previously acted as counsel. Second, appellant asks us to reconsider our decision on whether appellant's trial team was ineffective in how they handled the disclosure and admission of a Facebook conversation. We granted appellant's motion in order to clarify aspects of and correct errors in our earlier opinion.[1]

## LAW AND DISCUSSION

### A. Conflict of the Military Judge

Appellant asks us to set aside the findings because the military judge in the case had previously acted as counsel. Here, the military judge disclosed to appellant that he previously had served as the CoJ for III Corps. He also disclosed his forwarding to the trial counsel an email about the case. Appellant did not question or challenge the military judge. Affidavits from appellant's trial defense attorneys indicate that they were well aware of his prior service as the CoJ and tactically decided to proceed with LTC Faulkner rather than risk trial by a panel or one of the other two judges located at Fort Hood. Indeed, this tactical decision was based in part on the military counsel's assessment of a previous "favorable" case where Judge Faulkner had also previously served as the CoJ. Appellant then specifically requested to be tried by Judge Faulkner alone.

Appellant argues on appeal that the military judge acted as counsel under two theories. First, appellant argues that we should adopt the vertical imputation theory and impute to the military judge all the actions of his subordinates when he was the CoJ. Second, appellant argues that there is sufficient evidence in the appellate record for us to find that the military judge had acted as counsel in his own capacity.

### 1. Acting "As Counsel" Under R.C.M. 902(b) does not Require Vertical Imputation

In our previous opinion we rejected appellant's invitation to apply the vertical imputation theory to determine when a military judge has previously acted as

---

[1] The court did not adopt appellant's suggestion to take the case en banc.

counsel. In general, the theory imputes the actions of subordinates to their superiors to determine whether a military judge had previously acted "as counsel." We rejected this suggestion for several reasons. First, we noted that our superior court had specifically declined to adopt the theory in *United States v. Jones*, 55 M.J. 317 (C.A.A.F. 2001). Appellant correctly notes in his motion for reconsideration that the United States Court of Appeals for the Armed Forces (CAAF) did not reject the theory outright and left the door open for adopting the theory in the future. *Id.* at 321. Second, we noted the structural differences between federal courts and courts-martial. Specifically, we noted that the clarity and efficiency that the vertical imputation theory provided when applied to courts with strict geographic borders and limited personnel turnover would be difficult to obtain in our more distributed system of military justice. Third, we noted that even if we declined to read the vertical imputation theory into R.C.M. 902(b)'s prohibition on acting "as counsel" the general conflict rule contained in R.C.M. 902(a) would still be applicable.

In the motion for reconsideration appellant argues that this case is distinguishable from *Jones* and that "different facts could make for a different result." If appellant means that a court should determine whether the vertical imputation theory should be applied on a case-by-case basis, we disagree. If this court were to adopt the vertical imputation theory we would apply it to all Army cases under all circumstances. The advantage of appellant's proposal is the simplicity of a bright-line prophylactic rule. It avoids the fact-intensive question of whether a supervising attorney "acted" in a case. Had the rule been in effect, for example, we never would have had the series of cases involving the potential conflicts of LTC Faulkner. That is a notable advantage. However, such a benefit is only obtainable if, *ex ante,* military judges know that all their subordinates' actions are imputed to themselves when determining whether there is a conflict. It would make little sense to determine whether the vertical imputation theory would apply on an after-the-fact case-by-case basis on appeal.

This is also why we suggested that the vertical imputation theory would be difficult (but not impossible) to adopt. Within the Judge Advocate General's Corps, field grade officers usually change positions every two years or less. With no set geographic jurisdictional boundaries, all supervising attorneys would need to keep track of every case that any subordinate (and subordinate's subordinates) had touched. This would be more difficult if, as appellant argues in this case, cases were imputed to attorneys and their supervisors when they were still in the investigative stage. Applied to organizations that have no geographical or unit-based limitation, such as the attorneys in the Trial Defense Service (TDS) and the Trial and Defense Counsel Assistance Programs (TCAP & DCAP), the vertical imputation theory would be even more difficult. As the Chief and Deputy of the Trial Defense Service

supervise one or more attorneys in virtually every court-martial, they could not pragmatically later serve as military judges, even in cases they had never heard of, discussed, or acted upon.

This is why we said in our initial opinion that adopting the vertical imputation theory would be "blazing new appellate ground." Such a rule, although not strictly requiring such a result, at least for pragmatic reasons, would reach deep into the selection and assignment of military judges throughout the Army. Such a rule would also likely prevent actual, perceived, and potential conflicts in future cases. To appellant's point, this case and the other cases regarding LTC Faulkner weigh in favor of such an adoption, at least assuming that the list of cases touched by subordinates can be accurately determined and not become a matter of appellate "gotcha." Again, this is the problem of applying the doctrine to a system of justice that exercises jurisdiction "in all places." *See* Article 5, UCMJ.

One more point gives us caution. As a prophylactic rule, the vertical imputation theory is necessarily overbroad. That is, it would include in its orbit instances where supervising attorneys did not, in fact, ever act as counsel. Again, the benefit of such a rule is simplicity and clarity. However, this requires reading the rule to require something that both R.C.M. 902(a) and (b) by their plain language do not require. *See Jones*, 55 M.J. at 321 (Baker, J., concurring) (noting the statutory language of section (a) adopts a reasonable-person test rather than a strict-appearance standard). Although the military justice system has numerous examples of similar prophylactic provisions, they generally have their origins in a pre-*Clinton v. Goldsmith,* 526 U.S. 529 (1999), view of Article I court authority.

### 2. *LTC Faulkner did not Individually Act "As Counsel"*

Appellant also argues that even if we do not adopt the vertical imputation theory there is sufficient evidence in the appellate record that LTC Faulkner acted as counsel. While appellant points to no direct evidence, other than the one forwarded email we addressed in our earlier opinion, appellant argues that "normal practices" of LTC Faulkner and a "presumption [that] LTC Faulkner competently supervised subordinate counsel" is a sufficient factual basis to support the conclusion that he had acted "as counsel."

The affidavits on appeal establish that while LTC Faulkner was serving as the CoJ there was little forward movement in the investigation into appellant. Appellant himself swears in an affidavit submitted with his *Grostefon* matters that the investigation was "dropped" in "[e]arly 2012." This is also consistent with the affidavits from the trial counsels who were covering appellant's investigation. They

described a case that did not move forward for two years after the completion of the Army Criminal Investigative Command investigation, was not included in any of the documents used to track cases, and for which the office did not even maintain a casefile. Lieutenant Colonel Faulkner stated in his affidavit that this case was not on his tracker and that "I do not believe that I ever discussed this case with any trial counsel, law enforcement official, or anyone else while I was the chief of justice. . . ." Thus, the affidavits support that this was not a typical case in which LTC Faulkner's "normal practices" could arguably create an inference of actual supervisory authority.

However, let us assume that LTC Faulkner did discuss the case with trial counsel despite the lack of memory of any such conversation by any participant. In *United States v. Gutierrez*, 57 M.J. 148, 149-50 (C.A.A.F. 2002) our superior court "held that general advice to a trial counsel and investigator is not disqualifying." A person is disqualified from a position if they "performed the duties of a disqualifying position." *United States v. Stefan*, 69 M.J. 256, 258 (C.A.A.F. 2010). According to the logic of *Stefan*, mere advice to the trial counsel would not constitute as having acted as counsel.

However, both of these cases involved the disqualification of the Staff Judge Advocate which is perhaps a fundamentally different question than the disqualification of the military judge. Additionally, the CAAF's treatment of *Stefan* indicates that they thought any error in violating Article 6(c), UCMJ, was not a structural error, whereas the Supreme Court recently held in *Williams v. Pennsylvania*, when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding a defendant's case such an error is structural. 136 S. Ct. 1899, 1905, 1909 (2016).[2]

### 3. Structural Error can be Waived and Here any Error was Waived

Assuming LTC Faulkner had acted as counsel and such an error is structural, we nonetheless address whether appellant is entitled to relief. Appellant asserts the

---

[2] We recognize there may be a difference between the standards of recusal under R.C.M. 902 and the constitutional requirement of recusal at issue in *Williams*. However, we need not decide whether such a difference exists as we hold that even a constitutional requirement of recusal may be waived. As discussed in our initial opinion in this case, *Williams* involved a preserved challenge of recusal and found that had the appellant in *Williams* done nothing, while having full knowledge of the chief judge's prior involvement in the case, it is far from clear the Supreme Court would have still held that appellant was entitled to relief.

error in this case was structural because R.C.M. 902(e) provides that the military judge may not accept an accused's waiver of an R.C.M. 902(b) conflict.[3]

Appellant argues that therefore the error is "unwaivable" and we must set aside the findings.[4] We do not agree with appellant's analysis because even structural errors are subject to the doctrine of waiver. *See Weaver v. Massachusetts*, 582 U.S. \_\_\_\_ (2017).

As an initial matter, R.C.M. 902(e) is a limitation on the authority of the trial judge to "accept" waiver. However, whether an accused has waived an issue for appeal is a question of law we review de novo. *See United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017)(citing *United States v. Rosenthal*, 62 M.J. 261, 262 (C.A.A.F. 2005)). "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." *Id.* (citing *United States v. Girouard*, 70 M.J. 5, 10 (C.A.A.F. 2011) (quoting *Olano*, 507 U.S. at 733)).

Here the right at stake involves both R.C.M. 902 and the constitutional provisions of due process. Yet, the Supreme Court clarified just this term that even structural error of a constitutional dimension may be waived. *See Weaver,* 582 U.S. at \_\_\_\_. Rather than being a class of defects that is inherently "unwaivable," the structural nature of an error simply means that a particular deficiency is not amenable to a prejudice analysis. In the class of structural error, while prejudice is presumed, this says nothing of whether or not the error occurred or has been waived.

Even structural error is subject to waiver. "No procedural principle is more familiar to this Court than that a constitutional right may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a

---

[3] In our initial opinion we mistakenly stated that appellant had not asserted that any error was structural error.

[4] The rule does not quite say that the issue is "unwaivable" although we ourselves used that term in our initial opinion. The provision in R.C.M. 902(e) states that the military judge shall not "accept" a waiver. This is a different turn of phrase than is used in other provisions in the Manual for Courts-Martial. *See e.g.* R.C.M. 907(b)(1) ("nonwaivable grounds" for dismissal). Perhaps there is a legal difference between "accepting" a waiver of an issue and the issue being "unwaivable." If there is a difference, it would matter in a case where appellant waives the issue and the military judge mistakenly accepts the waiver. We do not find it necessary to decide this issue.

tribunal having jurisdiction to determine it." *Yakus v. United States*, 321 U.S. 414, 444, (1944). "Forfeiture is 'not a mere technicality and is essential to the orderly administration of justice.'" *Freytag v. Commissioner*, 501 U.S. 868, 895 (1991) (Scalia, J. concurring and quoting 9 C. Wright & A. Miller, Federal Practice and Procedure § 2472, p. 455 (1971)). Justice Scalia went on to say "[s]everal recent opinions flatly contradict petitioners' blanket assertion that structural claims cannot be waived." *Id.* To that point, the Supreme Court has stated that "[t]here is much to be gained by inducing the objection to be made at the trial court level, where (among other things) the error can often be remedied." *Puckett v. United States*, 556 U.S. 129, 130 (2009).

Indeed, many federal courts have interpreted the Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461, 467 (1997), as providing that structural error can be waived and forfeited. In *Johnson* the court determined a plain error review was appropriate even assuming the underlying error was "structural." *See e.g. United States v. Robinson*, 275 F.3d 371, 383 n.4 (4th Cir. 2001)*; Dean v. Woods*, No. 2:15-cv-13911, 2016 U.S. Dist. LEXIS 117137 (E.D. Mich. Aug. 31, 2016).

The CAAF has generally applied the Supreme Court's interpretation of structural error. *See e.g. United States v. Wiechmann*, 67 M.J. 456 (C.A.A.F. 2009); *United States v. Brooks*, 66 M.J. 221, 223-24 (C.A.A.F. 2008); *United States v. Upham*, 66 M.J. 83 (C.A.A.F. 2008).[5] In *Upham*, the CAAF stated "[w]e apply the Supreme Court's structural error analysis, requiring mandatory reversal, when the error affects 'the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" 66 M.J. at 86 (citing *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)).

However, the requirement for mandatory reversal is limited to instances of "preserved error." In cases of preserved error, if prejudice is presumed there is nothing left to decide. Error + prejudice = reversal. Judge Goldsmith interpreted and explained *Johnson* as follows:

> Although structural errors are per se reversible and not subject to harmless error review, such errors are nevertheless subject to the general rules of waiver, forfeiture, and default.

---

[5] In *Weichmann, Brooks, and Upham* the C.A.A.F. adopted Supreme Court analysis for structural error, but in each case did not actually find structural error.

*Porter v. Tribley*, No. 14-CV-10171, 2014 U.S. Dist. LEXIS 162935, at *9 (E.D. Mich. Nov. 21, 2014); *See also United States v. Suescun*, 237 F.3d 1284, 1288 n.12 (11th Cir. 2001) (Structural defects do not absolve a defendant's waiver of a defense or objection.); *Durr v. McLaren*, No. 15-1346, 2015 U.S. App. LEXIS 15871, at *3 (6th Cir. Aug. 28, 2015) ("although the violation of the right to a public trial is a structural error not subject to harmless-error review, the right may nevertheless be waived."); *United States v. Christi*, 682 F.3d 138, 142-43 (1st Cir. 2012) ("The structural character means only that if Christi could now raise the issue he would not need to show any particular prejudice if otherwise entitled to relief."); *United States v. Kieffer*, 681 F.3d 1143, 1158 (10th Cir. 2012) ("Under either plain or structural error analysis, "[f]irst, there must be an error or defect—some sort of 'deviation from a legal rule'—that has not been . . . affirmatively waived."); *Brown v. Gibson*, 7 F. App'x 894, 910 n.10 (10th Cir. 2001) ("Because Mr. Brown knowingly, voluntarily and intelligently waived his right to be present, we do not address his claim of structural error."); *Johnson v. Bauman*, No. 2:14-CV-10976, 2016 U.S. Dist. LEXIS 141046, at *17 (E.D. Mich. Oct. 12, 2016); *but see United States v. Nelson*, 277 F.3d 164, 206 (2d Cir. 2002) (when juror is actually biased *and* is initially challenged, subsequent waiver may be invalid).

Consider, for example, *United States v. Robinson* where the Fourth Circuit addressed forfeiture in the context of structural error:

> Robinson asserts that plain error review does not apply because a violation of § 3005 is a structural defect. We disagree. Even if a violation of § 3005 is a structural defect, *cf. Boone*, 245 F.3d at 361 n.8 (noting that a violation of § 3005 is not amenable to harmless-error analysis), it is well settled in this circuit that plain error review applies to forfeited structural errors. *See, e.g.*, *United States v. David*, 83 F.3d 638, 647-48 (4th Cir. 1996) (applying plain error analysis to forfeited structural error).

275 F.3d 371, 383 n.4 (4th Cir. 2001).

Finally, after appellant submitted his request for reconsideration, the Supreme Court again weighed in on the issue of structural error. In *Weaver v. Massachusetts*, the Court emphasized the important distinction between preserved and unpreserved structural error:

> If an objection is made at trial and the issue is raised on direct appeal, the defendant generally is entitled to

> "automatic reversal" regardless of the error's actual "effect on the outcome." *Neder* v. *United States*, 527 U.S. 1, 7. If, however, the defendant does not preserve a structural error on direct review but raises it later in the context of an ineffective-assistance claim, the defendant generally bears the burden to show deficient performance and that the attorney's error "prejudiced the defense." *Strickland* v. *Washington*, 466 U. S. 668, 687. To demonstrate prejudice in most cases, the defendant must show "a reasonable probability that . . . the result of the proceeding would have been different" but for attorney error. *Id.*, at 694.

582 U.S. at ____. As the *Weaver* Court makes clear, had the defendant in that case preserved the structural error at trial his conviction would have been overturned. Instead, the *Weaver* Court affirmed. While the Court's opinion in *Weaver* was self-limited to the narrow structural error caused by the denial of the right to a public trial, the reasoning is consistent with how federal courts have interpreted *Johnson* applying waiver and forfeiture within a structural error context.

Accordingly, even assuming there was a violation of R.C.M. 902(b), and even further assuming that any such error was structural, we would still find appellant has waived the error. Appellant walked into this issue with his eyes wide open. Appellant's counsel were well aware of LTC Faulkner's prior duties as the CoJ even before trial. LTC Faulkner then disclosed and discussed this issue with appellant and his counsel. Appellant had no objection to LTC Faulkner and then later affirmatively *and personally* requested to be tried by LTC Faulkner. The record establishes appellant's waiver was both knowing and tactical.

Based on the colloquy with the military judge, the affirmative disclaimer of any challenge to the military judge, and a specific request to be tried by this particular military judge, appellant waived any error in the military judge sitting on the case.

### B. Ineffective Assistance of Counsel

At appellant's request we also reconsider our previous decision regarding appellant's claim of ineffective assistance of counsel. The difficulty of appellant's burden to establish ineffective of assistance of counsel – and it is his burden – was summarized by the Supreme Court as follows:

> Surmounting *Strickland*'s high bar is never an easy task.
> An ineffective-assistance claim can function as a way to
> escape rules of waiver and forfeiture and raise issues not
> presented at trial, and so the *Strickland* standard must be
> applied with scrupulous care, lest intrusive post-trial
> inquiry threaten the integrity of the very adversary process
> the right to counsel is meant to serve. Even under *de novo*
> review, the standard for judging counsel's representation
> is a most deferential one. Unlike a later reviewing court,
> the attorney observed the relevant proceedings, knew of
> materials outside the record, and interacted with the client,
> with opposing counsel, and with the judge. It is all too
> tempting to second-guess counsel's assistance after
> conviction or adverse sentence. The question is whether an
> attorney's representation amounted to incompetence under
> prevailing professional norms, not whether it deviated
> from best practices or most common custom.

*Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotations and citations omitted).[6]

Finally, *Richter* reemphasized that our task is an "objective" inquiry into the tactical decisions of the trial attorney. *Strickland* "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Id.*, at 110. Thus while a counsel's subjective explanations for their decisions are relevant, they are not controlling.

Appellant's brief alleges several instances where he asserts ineffective assistance through both a diligent and studious examination of the record of trial. In the end, however, we find appellant has fallen short of demonstrating that his civilian and military defense counsel were constitutionally infirm. We apply the "strong presumption" of competence and ignore the temptation to review appellant's claims of deficient performance with the benefit of appellate hindsight. *Strickland v Washington*, 466 U.S. 668, 687 (1984). We address each complaint in turn.

---

[6] *Harrington v. Richter* involves application of *Strickland* through the lens of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) within the context of federal collateral review of a state criminal conviction. We see those portions of the opinion addressing AEDPA, to include the "doubly" deferential standard of review, to be inapplicable to an IAC claim reviewed by this Court on direct appeal.

### 1. *"Failing to Prepare"*

Appellant alleges that his civilian counsel failed to prepare for trial by: 1) not interviewing the alleged victim pretrial; 2) not printing out evidence pretrial; and 3) not interviewing a government expert pretrial.

First, appellant claims his counsel provided ineffective assistance of counsel when they failed to interview the complaining witness. Contemporaneous statements in the record of trial as well as the unrebutted post-trial affidavits establish that the complaining witness was a reluctant participant in the trial and refused to be interviewed despite counsel's efforts. We find no deficient performance as counsel cannot compel a pretrial interview. *See United States v. Guardado*, 75 M.J. 889, 904 (Army Ct. Crim. App. 2016) (pet. granted on other grounds by *United States v. Guardado*, No. 17-0167/AR, ARMY 20140715 (C.A.A.F. 3 March 2017) (order)).

Second, appellant argues that his counsel offered him poor advice when they recommended he waive the Article 32 preliminary hearing. Appellant states that "[o]ne must wonder what legitimate rationale defense counsel can offer for this decision. . . ." The post-trial affidavits as well as contemporaneously written memorandums for record establish that the defense reasonably believed there was a likelihood that AM would not appear at trial. Accordingly, the defense feared that her Article 32 testimony could be admitted against appellant if AM was declared unavailable. Also, the defense anticipated that the government would prefer additional charges against appellant if they proceeded with the Article 32 hearing. The record likewise had a detailed colloquy between the military judge and appellant regarding his decision to waive the hearing. We find neither deficient performance nor prejudice.

Third, appellant claims that his counsel failed to print exculpatory Facebook messages between appellant and the alleged victim ("AM") before trial. Appellant agrees the messages were printed during a break in the trial. Accordingly, we see no prejudice from the failure to print out the messages before trial when they were eventually printed.[7]

Fourth, appellant alleges that his counsel failed to conduct a pretrial interview of a government expert witness. The record indicates that the expert witness was unavailable for consultation until a government contract was finalized. We find no prejudice as defense counsel asked for and received a mid-trial recess in order to interview the expert.

---

[7] We address separately appellant's claim that portions of the messages should have been introduced as exculpatory evidence and that other portions should not have been turned over to the government.

### 2. *Failing to Object*

Appellant alleges numerous instances where he now claims his counsel should have objected to trial testimony.

First, appellant claims that the defense should have objected to the hearsay statements of Ms. Robles. Appellant claims the government did not lay a hearsay exception foundation when Ms. Robles repeated AM's statements that appellant had sexually abused her. We find appellant's assertion to be meritless.

Ms. Robles testified that AM appeared at her screen door knocking softly. She described AM as having "dirt on her, up her legs and her hair was a mess and she was just like hysterical, crying when I opened the door." Ms. Robles testified she asked AM several questions about how she was and where she had been but AM "was just crying and crying." The government then elicited that Ms. Robles had never seen AM ever like this before. Only then did the government ask Ms. Robles to repeat what AM had told her. Ms. Robles further testified that AM remained in the same emotional state while recounting that appellant had abused her.

The government had clearly attempted to lay the foundation for the "excited utterance" exception to the hearsay rule. *See* Military Rule of Evidence [hereinafter Mil. R. Evid.] 803(2). While the temporal proximity of the abuse to the "excited utterance" was not developed we do not find deficient performance. Assuming there were grounds to object to the testimony as hearsay, any objection would have both highlighted the issue to the fact-finder and invited the trial counsel to lay a deeper foundation which may have only given the testimony additional weight.

To establish deficient performance it is not enough to demonstrate that no objection was made at the trial level. Appellant must also show that there is no objectively sound reason to not object. To establish prejudice, appellant must show both that the objection would have been sustained if made and that there is a reasonable probability that the results of the trial would have been different if the objection was sustained. Appellant has not met his burden on either prong.

Second, appellant argues that his counsel failed to object when Ms. Robles' mother, Ms. Woodby, was asked to provide improper character evidence about AM. Ms. Woodby was asked whether AM was a happy or sad child. Ms. Woodby answered that she "[n]ever saw her smile." Appellant complains that this was improper character evidence. Appellant does not articulate any specific prejudice from this testimony. Given the alleged error was not objecting to rather innocuous testimony, we do not find deficient performance. We also find appellant has failed to meet his burden of establishing any prejudice.

Third, appellant argues that his counsel should have objected to Ms. Woodby's testimony regarding AM's desire to talk to only female police officers. Ms. Woodby testified that upon hearing the allegations of abuse she called the military police. She further explained that she and her husband did not allow anyone into the house until female police officers arrived. Appellant argues to us that the "testimony was irrelevant." To the contrary, we find the testimony relevant under Mil. R. Evid. 401 and therefore do not find appellant has met his burden of establishing deficient performance. We do not address whether the testimony was improper hearsay under Mil. R. Evid. 801 or whether the testimony would have been objectionable under Mil. R. Evid. 403. We also do not find prejudice.

Fourth, appellant claims his counsel should have objected to portions of AM's testimony that anticipated the questions that she would be asked during cross-examination. The government's questions were designed to rebut a defense "transference" strategy, allegations of recent fabrication, and frontloaded explanations for prior inconsistent statements. Appellant does not argue to us that the testimony would not eventually be admissible, just that it was prematurely raised during direct examination. We do not find deficient performance when counsel offer no objection to testimony which they anticipate will eventually be admissible after cross-examination. The decision to object to such testimony is within the range of decisions that competent counsel may make. We also find no prejudice to appellant from the premature admission of testimony on direct examination that would have been admissible during re-direct examination.

Fifth, appellant argues that AM testified to instances of uncharged misconduct. Appellant cites AM's testimony that appellant had masturbated in front of her. Appellant correctly asserts that there was no objection to this testimony. However, it is entirely unclear whether the testimony was inadmissible. Appellant does not claim that the government failed to provide notice under Mil. R. Evid. 404(b). Nor does appellant explain to us why the testimony would not meet the requirements for admissibility under that same rule. Additionally, given AM's extensive testimony on charged instances of abuse it is unclear why this testimony would have had a reasonable likelihood of changing the result in a case that turned on credibility. Accordingly, we find appellant has not met his burden of establishing either deficient performance or prejudice.

Sixth, appellant claims that his counsel failed to object when AM and the trial counsel used "conclusory" terms such as "rape" and sexual assault. Appellant cites as an example the trial counsel's question "And can you tell us of the next instance you remember of Sergeant Pasay raping you?" While we would agree that a military judge would be within his or her discretion to direct the trial counsel to rephrase the question upon an objection, it is not clear that such a direction would be required. AM had explained her definition of "rape" as penetration which provided context to the question, especially as appellant's offenses involved sexual acts with a child who

could not consent as a matter of law.  In this trial by military judge alone we see no deficient performance or prejudice in failing to object to the trial counsel's use of language.

### 3.  Failing to Introduce Evidence

Appellant asserts that his trial defense counsel erred in failing to introduce certain evidence.  We address each in turn.

First, appellant asserts that his counsel erred when they failed to provide notice of their intent to introduce evidence under the residual hearsay rule.  *See* Mil. R. Evid. 807.  The defense attempted to introduce a Red Cross message appellant received while deployed.  When the government objected that the message contained hearsay, the defense attempted to introduce the message under the residual hearsay rule.  As the defense had not provided the notice required by Mil. R. Evid. 807 the military judge sustained the government's objection.  We find no prejudice for several reasons.  First, the message was not otherwise admissible as residual hearsay.  Thus, even had the defense provided notice the message would have still not met the requirements under Mil. R. Evid. 807.[8] Second, appellant testified to having received the Red Cross message.  Third, AM's mother testified she sent appellant a Red Cross message.  Finally, appellant does not explain to us the prejudice to appellant's case when the message was not admitted.[9]

---

[8] Appellant does not assert his counsel should have tried to self-authenticate the Red Cross message as a business record.  *See* Mil. R. Evid. 902(11) and 803(6).

[9] During the course of our Article 66, UCMJ, review we of course conduct a de novo review of the record.  Having conducted such a review, we are aware of how the Red Cross message fits into the trial and we do not independently find prejudice.  However, appellant's burden to establish ineffective assistance of counsel requires him to connect these dots; not rely on us to connect them for him.  Otherwise, there would be no meaning to placing the burden on appellant.  If failing to admit the Red Cross message constitutes ineffective assistance of counsel, appellant must connect the evidence to a defense or an element of the offense in a manner where we can find a substantial likelihood that the admission of the evidence would alter a finding.  When the evidence is relevant to some specifications, but not others, this needs to be explained.   Establishing deficient performance does not itself establish prejudice.  To paraphrase the Supreme Court in *Puckett v. United States*, that would be simply an *ipse dixit* recasting of the deficient performance as the prejudice.  "Any trial error can be said to [be prejudicial] if the harm is defined as "being convicted at a trial tainted with [fill-in-the-blank] error." 556 U.S. at 142.

Second, appellant argues that his defense counsel were ineffective when they failed to cross examine AM on inconsistent statements. Specifically, appellant points to AM's testimony that the abuse began after her ninth birthday. Appellant notes that a defense expert testified that he read a law enforcement report in which AM had stated the abuse began when she was eleven years old. Similarly, AM testified that appellant had started raping her (i.e. penetrative acts) when she was thirteen but appellant claims that she told police that it had begun when she was eleven. Given that appellant's counsel cross-examined AM on numerous inconsistent statements, that such cross-examination would have opened the door to AM perhaps discussing additional allegations of abuse, we see no deficient performance or prejudice in not cross-examining AM on this matter.

Third, appellant argues that his defense counsel failed to introduce extrinsic evidence of AM's prior inconsistent statements. The defense counsel cross-examined AM on her inconsistent statements as to whether appellant had filmed her with a laptop computer or a digital camera. Appellant argues that the defense should have called "the witness who AM allegedly made these inconsistent statements to. . . ." Appellant does not tell us who this witness is or what they would have testified about. Additionally, appellant does not address whether it would have been permissible to introduce extrinsic evidence of such a prior inconsistent statement. *See* Mil. R. Evid. 613(b); *United States v. Loving*, 41 M.J. 213, 245 (C.A.A.F. 1994) (Extrinsic evidence must relate to a "material issue" in the case").

Fourth, appellant argues that his defense team should have called Ms. Poorman as a witness. Appellant claims that Ms. Poorman "could have testified [appellant's ex-wife] had a motive to fabricate her testimony, and should have impeached [her] testimony that the family did not have money trouble." In an affidavit submitted on appeal by appellant, Ms. Poorman states that appellant's ex-wife was very angry that appellant had remarried and that upon finding out that his new wife was pregnant she "cried and was very upset about the entire situation." She also states appellant's ex-wife would threaten to "destroy his career" whenever she was mad at appellant. She states that the Pasay family had serious financial problems.[10] However, Ms. Poorman also states that when telephoned by the defense a few days before trial she told the defense counsel she could not attend the trial.

In an affidavit, the lead defense counsel defense stated that he did not call Ms. Poorman because her testimony was cumulative with her husband's testimony who was a "much better and more credible witness." He explained that he assessed SSG Poorman as the more credible witness. He feared Ms. Poorman would be impeached

---

[10] Ms. Poorman does not state whether she has any personal knowledge of the Pasay family finances or whether she would be repeating hearsay. Mil. R. Evid. 602. *See United States v. Cade*, 75 M.J. 923 (Army Ct. Crim. App. 2016).

because her previously close relationship with appellant's ex-wife ended over a dispute about money. In reply, appellant argues that "just because the government will argue a witness is biased does not mean the witness should not be called." True enough. However, the hind-sight judging of tactical decisions is exactly what we are not supposed to do when evaluating a claim of ineffective assistance of counsel.[11] While appellant clearly now disagrees with the decision not to call Ms. Poorman, this tactical call did not amount to a constitutional deprivation.

### 4. The Facebook messages

Appellant assigns to us on appeal that his counsel were ineffective in their handling of a Facebook conversation. During trial appellant's civilian defense counsel stated he needed a recess in order to print this conversation and to provide it to the government.[12] The conversation was marked but not admitted.

The exhibit is a seven-page printout of a Facebook conversation between appellant and AM that happened between 5 January 2012 and 9 January 2012. The first six pages are generally favorable to appellant as AM appears to talk lovingly with him and argues in favor of moving closer to where he lives. On page six, AM tells appellant "&& It would just be so much easier if we were closer." Less than seven hours later, on page seven of the exhibit, appellant responds that if AM ends up homeless or in trouble "I know im the last person u want to live with but if things go bad there u [and AM's brother] r always my kids n my door is always open for u two..i love u. . . ."

Appellant argues that his counsel was ineffective for not admitting the first six pages of the conversation. Appellant also argues that his counsel was ineffective for providing the government with the seventh page. In our initial opinion we described this as illogical, but perhaps too quickly. We therefore provide additional explanation below.

---

[11] We would note that the defense team initially requested the production of Ms. Poorman as a witness but the request was denied as evidenced by an attachment to App. Ex. V. The defense filed a motion to compel, but focused their motion on witnesses other than Ms. Poorman.

[12] Appellant avers that the government only became aware of the conversation because his counsel printed the conversation on the trial counsel's computers after printing attempts at the defense counsel's office and at a Kinko's had failed. As appellant's counsel stated on the record that he intended to provide the conversation to the government we do not think it important who printed what on which computer. Ultimately, it is the civilian defense attorney's decision to provide the government with information that we are concerned about; not how he effectuated that decision.

### a. *Providing the Government with the Seventh Page*

Appellant claims his counsel should not have provided the seventh page to the government as that page was inculpatory. During cross-examination appellant agreed that he had told AM that he was the last person she would want to live with.

As an initial matter, although not addressed by any party, it would appear that if the defense had introduced the first six pages of the Facebook conversation — as appellant asserts they should have done – the government "may require the introduction, at that time, or any other part – or any other writing or recorded statement - that in fairness ought to be considered at the same time." Mil. R. Evid. 106. Additionally, Mil. R. Evid. 613 requires that when a witness is examined about a prior statement the offering party "must, on request, show it or disclose its contents to an adverse party's attorney." Thus it is far from clear to us how appellant would not have had to turn over the seventh page in any event. However, it is not necessary for us to determine decisively whether these rules would have ultimately required the seventh page to be provided to the government. All we need to determine is whether the defense team's decision to provide all seven pages to the government was within the range of objectively reasonable competent decisions. It was.

On appeal, the government responds that the whole conversation should have been turned over in discovery, thus there was not error. Rule for Court-Martial 701(b)(1)(A) requires the defense to provide the government with all signed statements of witnesses listed by the defense. Appellant had "adopted" the government's witness list and requested the production of all witnesses listed by the government. *See* (App. Ex. V, Witness Request, 21 July 2014; Witness Request Addendum, 23 July 2014). Accordingly, by placing AM on the defense witness list, the defense was required to turn over all signed statements by AM, possibly including the Facebook conversation.[13] Additionally, R.C.M. 701(b)(3) requires defense disclosure of all documents the defense intends to introduce. If the defense should have admitted the Facebook conversation, as appellant claims on appeal, it would need to be disclosed pretrial. Given their pretrial obligations we see no deficient performance in turning over the seventh page.[14]

---

[13] We do not decide whether a Facebook message sent by a unique account holder is a "signed" statement for purposes of R.C.M. 701. Rather, our inquiry is limited to whether counsel acted within a broad range of competent performance.

[14] What the defense team could not do is fail to provide discovery as required by R.C.M. 701, disclose and introduce the first six pages mid-trial, and then hope that because of the surprise disclosure the government would be caught off guard and fail to discover that there was a seventh page. Framed more appropriately for the issue before us, a decision not to engage in such a course of conduct is one a competent counsel may make.

Appellant replies that the defense was not obligated to turn over the seventh page in discovery, in part, because "the government has the same access to this evidence." Appellant cites to *United States v. Province*, 45 M.J. 359, 361-363 (C.A.A.F. 1996), to support his position that there is no need to disclose to the government what the government already has. *Province* stands for the proposition that a defense attorney need not provide the government with the government's own files. Its application to evidence obtainable from witnesses, as appellant argues, would violate R.C.M. 701. However, this is all beside the point.

Appellant argues to us that there was no need to disclose the seventh page because the government already had access to the seventh page. It therefore necessarily follows that appellant was not prejudiced when his counsel gave the government something to which they already had access. Put differently, if the defense counsel need not have turned over a document because they reasonably believed the government already had access to it, it is also not deficient performance to provide a document the counsel could reasonably believe the government already had.

Finally, we would note that it is clear from the print out of the sixth page that the conversation continued onto a seventh page. Had appellant's counsel done as he now asserts and only provided the first six pages to the government, any observant trial counsel would have noticed the omission. Even if R.C.M. 701, Mil. R. Evid. 106, or Mil. R. Evid. 613 would not have compelled the defense to turn over the seventh page, it is reasonable that AM could have provided the government with the seventh page, as appellant himself admits on appeal.

*b. Failure to Admit the First Six Pages*

Appellant argues that his counsel were ineffective when they did not admit the first six pages of a Facebook conversation. As discussed above, in the first six pages AM talks favorably about living closer to appellant; a view that is inconsistent with her allegations of abuse.

During the cross-examination the defense counsel asked AM about this conversation. AM stated she did not remember the Facebook conversation. Asked specific questions, AM denied reaching out to appellant "to try to convince him to come and live again with him in Texas." She admitted sending appellant messages saying that she loved him. She said she didn't believe she had asked appellant to convince her mother to live with him in Texas. She then agreed that she had told appellant how much she missed him. AM's trial testimony is consistent with parts of the Facebook conversation and inconsistent with others.[15]

---

[15] In our initial opinion we mischaracterized her testimony as having agreed with all of the questions.

Appellant faces several hurdles in arguing that it was ineffective not to admit the first six pages of the Facebook conversation.

First, during re-direct examination appellant was handed a copy of the Facebook conversation and asked to read it to himself. His defense counsel then asked appellant about the conversation. The government objected. The defense counsel explained that "[t]his goes to a prior inconsistent statement, some of the things [AM] was cross-examined on. She denied wanting to come back and live with him, and she also denied having messaging with him at all." The military judge overruled the trial counsel's objection and appellant testified that AM had told him how much she missed appellant and how she and her brother wanted to come back and live with appellant. In other words, although the exhibit itself was not admitted through appellant's testimony, extrinsic evidence of AM's prior inconsistent statements was admitted as evidence.

Second, appellant argues that the Facebook conversation should have been admitted as substantive evidence, but appellant has not explained why the exhibit is not hearsay. In the conversation AM states that she loves appellant and wants to live closer to him, apparently offered for the purpose of informing the factfinder that AM loved appellant and wanted to live closer to him. If there is an applicable hearsay exception appellant does not point us to it.

Third, offered as prior inconsistent statements of AM (i.e. not substantive evidence) it is extrinsic evidence of prior inconsistent statement. *See* Mil. R. Evid. 613. Accordingly, the statement must be "material" to be admitted. *Loving,* 41 M.J. at 245. While a statement where AM had denied being abused would be material, not every statement that is arguably inconsistent with trial testimony is material. Additionally, prior to admitting the exhibit the defense would have been required to provide AM the opportunity to "explain or deny" the statement. Mil. R. Evid. 613. Additionally, the government would have been required to have the opportunity to examine AM about the statement. *Id.* While it is possible that the defense counsel's brief cross-examination met this requirement, it is also possible that the military judge would have required additional foundation before allowing the defense to introduce extrinsic evidence of a prior consistent statement to show that it was material and to provide AM with the opportunity to further explain the statement.

Fourth, although neither party has expressed concern about the documents provenance, even on appeal, no one has authenticated the exhibit. As AM testified she did not remember the conversation, it is far from clear that she could have authenticated the exhibit. While appellant discusses the Facebook conversation in his affidavit he does not authenticate it. To prove on appeal that it was ineffective not to admit a document at trial appellant must at least demonstrate that the document was in fact admissible.

Finally, within the context of the entire trial, and notwithstanding our extensive discussion, the Facebook conversation was relevant, but not substantially so. The first six pages were not significantly helpful and the seventh page was not very incriminating. In a child sex abuse case, it is not particularly exculpating that the child sometimes discusses her alleged abuser in positive terms. AM admitted as much when she admitted on cross-examination that she told appellant she loved him and missed him. But nor was is it significantly incriminating that appellant admitted on the seventh page that he had told AM that he was the last person with whom she would want to live. Appellant's defense was not painting a portrait of familial harmony. Indeed, on redirect appellant was asked to explain his message to AM. He explained that at the time he sent the message AM had already accused him of abuse. It was not disputed that the Pasay family had fractured.

*C. Sentence Appropriateness*

Although not specifically raised by appellant in his motion for reconsideration, we considered anew whether appellant's sentence of fifty-one years of confinement is too severe. Although not dispositive, the severity of this term of confinement is underscored by the government's request of thirty-seven years confinement. After reviewing the record, to include the matters submitted by appellant pursuant to R.C.M. 1105 and the issues raised by appellant in *Grostefon*, we find that a sentence that provides for a dishonorable discharge, confinement for forty-five years, forfeiture of all pay and allowances, and reduction to the grade of E-1 appropriately punishes appellant for his crimes. Our resolution of this issue should not be interpreted as diminishing the severity of appellant's acts or as minimizing the harm he caused to AM, but rather reflects our assessment of the evidence in light of the nature of the offenses and the *Wheeler* factors. Dep't of Army, Pam. 27-9, Legal Services: Military Judges' Benchbook, para 2-5-23 (10 Sept. 2014); *See also United States v. Wheeler*, 17 U.S.C.M.A. 274, 38 C.M.R. 72 (1967).

**CONCLUSION**

Based on the adopted analysis of factual sufficiency of our original opinion, the court affirms only so much of the finding of guilty of Specification 12 of Charge I as finds the appellant:

> Did, at or near Killeen, Texas, between on or about 28
> June 2012 and on or about 1 September 2012, commit a
> sexual act upon AM, to wit: penetrating with his penis,
> the vulva of AM, by causing bodily harm to AM.

The remaining findings of guilty are AFFIRMED. After considering the entire record, the court affirms only so much of the sentence as provides for a dishonorable discharge, confinement for 45 years, forfeiture of all pay and allowances, and reduction to the grade of E-1. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of the findings set aside by our decision, are ordered restored.

Senior Judge MULLIGAN and Judge FEBBO concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court